ALFREDO RONDÓN, ETC., Plaintiff and Appellant, *v*. THE AETNA CASUALTY & SURETY Co., Defendant and Appellee.

No. 7950. Argued January 4, 1940.—Decided March 30, 1940.

*Miguel Olmedo Toste* for appellant. *Hartzell, Kelly & Hartzell* and *Rafael O. Fernández* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the court.

The present case, which was initiated in the District Court of San Juan in 1926, after numerous controversies which gave rise to two appeals to this court (41 P.R.R. 101 and 46 P.R.R. 593), went to trial in April 1937.

It is herein sought to recover from the insurance company the amount of a judgment rendered against a public carrier insured with it. The facts as alleged in the complaint are as follows:

Juan Basabe, the owner of a motorbus, was engaged in the transportation of paying passengers in San Juan under authority of the Public Service Commission. In compliance with rule III of the Regulations of said Commission, Basabe filed a bond or policy to answer for any compensation awarded to any person injured as the result of an accident due to the carelessness of the public carrier or its employees, up to the sum of $3,000.

Plaintiff and appellant herein sued Basabe in the District Court of San Juan, claiming damages for injuries suffered on February 13, 1926, as the result of an accident due to the carelessness of an employee of the defendant, and got a judgment whereby Basabe was ordered to pay $3,000 as compensation, besides costs including attorney's fees fixed at $602.75. The writ issued for the execution of the said judgment was returned unsatisfied, because Basabe was insolvent and did not own attachable property.

It is alleged in the complaint that Basabe complied with the terms of the policy as regards the accident and the action brought against him, and that the defendant company, notwithstanding having had knowledge of the commencement of said action, abandoned the same and failed to intervene or become a party thereto.

The defendant company answered and denied all and each of the essential facts of the complaint and in particular that

it had abandoned the action filed by the plaintiff against Basabe, and alleged, on the contrary, that Basabe refused to cooperate with the defendant in defending said action, thus failing to comply with the terms of the policy, and therefore the defendant was relieved of all liability. It further alleged that Basabe broke the terms of the policy, because at the time of the accident the vehicle was being operated by a person who lacked the age and the license required by law, thus relieving the defendant from all liability under the policy.

After a trial the lower court gave judgment for the defendant with costs on the plaintiff, exclusive of attorney's fees.

The trial court conclusively held that the injuries received by the plaintiff were caused by the negligence of an employee of Basabe; that Basabe was adjudged to pay to the plaintiff compensation for the injuries inflicted on him; and that the judgment could not be satisfied because Basabe was insolvent. It defined the essential issue between the parties as follows:

"In our judgment, the only issue is. . . . whether indeed at the time of the accident the vehicle was being driven by a person who lacked the age and the license required by law."

■ The following is a summary of the evidence introduced by both sides bearing on the question in issue:

"The plaintiff introduced in evidence a negative certificate issued by the demographic registrar of San Juan to the effect that there was no record in his books of the birth certificate of Julio Basabe who was the person who operated the vehicle at the time of the accident.

"The defendant submitted a certificate from the same demographic registry on which it is stated that Julián Basabe Fernández, the legitimate son of Juan Basabe and Ana Fernández, was born on November 10, 1910.

"It conclusively appears from the oral testimony that Juan Basabe, the insured under the policy sued upon herein, is or was married to Ana Fernández and that out of that marriage no son other than Julio was born and known by the name of Julián and so it appears

that the birth certificate of Julián Basabe does not correspond to another son besides Julio born to Juan Basabe by his marriage with Ana Fernández.

"It is of common knowledge that it is customary in this country to apply the names of Julio and Julián indiscriminately as if they were the same, and we are also familiar with the habit of the common people to shorten names by suppressing syllables either at the beginning or at the end thereof.

"The plaintiff sought to prove that the Julián Basabe who, according to the birth certificate, was born in 1910, is a natural son of Juan Basabe and Saturnina Dávila, whom Basabe registered as his son by his marriage to Ana Fernández. But apart from the fact that there is no proof in support of such theory, save a mere conjecture of the plaintiff, it further appears that according to the testimony of Severiano Ortiz, a witness for the plaintiff, godfather to one of Juan Basabe's children and an intimate friend of the latter and his family, the man named Julián and the son of Saturnina is a man rather old, older than the oldest son of Ana Fernández known as Juan, it being reckoned by the witness that Julián the son of Saturnina is about 40 years old.

"To show that the birth certificate of Julián Basabe Fernández submitted in evidence by the defendant can not possibly be that of Julián the son of Saturnina Dávila, we will transcribe the following paragraphs from the testimony of witness Severiano Ortiz:

" 'Q.—Do you know anybody by the name of Julián Basabe?

" 'A.—I do. He is out there. I know him.

" 'Q.—This one and also Julio?

" 'A.—Yes, Sir, the step son of Juan Basabe.

" 'Q.—Has Julio ever been known as Julián, that you know of?

" 'A.—No, Sir, Julio or Julio Basabe.

" 'Q.—Tell the court the degree of intimacy between you and this family ever since the birth of this boy.

" 'A.—I will explain. Juan Basabe worked as a painter at the Naval Station and I worked as a mason at the Naval Station, and Julián Basabe as a little boy used to take the lunch and dinner to him there.

" 'Q.—Julián, the step son?

" 'A.—Yes, Sir, Julián is the step son who used to take the dinner every day, and Juan was living with Julián's mother and he had Julián and three more; later on he married the mother of Juan and of Julio and of some others who are living. When Juan was

born he wanted me to be the godfather and I christened Juan Basabe who is now a man. I was the godfather and we are "compadres".

" 'Q.—What have been your relations ever since with this family?

" 'A.—We have been friends from boyhood and also have worked together and are "compadres." I am simply a friend of the family.

"If prior to the marriage of Juan Basabe and Ana Fernández the former already had three sons by Saturnina Dávila, and there was Julián the step son who of· course was older than the three children by Saturnina, and he was old enough to take the dinner to his step father at his work in the Naval Station, which means that he must have been at least seven, it is logical to assume that he must be at least 10 years older than Julio Basabe the son of Ana Fernández, who, as appears from the evidence, is not the eldest son of the married couple. Such being the case, the great discrepancy in age prevents mistaking the one for the other. Moreover, the plaintiff himself in his complaint against Juan Basabe, in action No. 1253 which gave rise to the judgment on which the present action is based, does not seem to be unaware of this fact, for in paragraph 3 of his last amended complaint filed on June 28, 1926, he alleged as follows:

" '3. That the motorbus that caused such injuries to the plaintiff is motorbus license plate number 49, known as "La Palmira," owned by the said defendant Juan Basabe, and was driven at the time of the accident by a son of said defendant, Julio Basabe, as chauffeur, but who was not qualified to drive such vehicle.'

"We entertain no doubt, from the above facts, that the birth certificate produced in evidence by the defendant belongs to Julio Basabe, the driver of the insured vehicle on the day of the accident, and such being the case and the latter having been born according to the said certificate on November 10, 1910, and the accident having occurred on February 13, 1926, at that time the said chauffeur was 15 years, 3 months and 3 days old."

The appellant maintains that it was error for the lower court to hold that the age of chauffeur Julio Basabe had been conclusively proven by the birth certificate of Julián Basabe from the demographic registry; and in holding that the name of Julio is the derivative or diminutive of Julián.

We have carefully considered the evidence submitted by the parties. There is no doubt whatever that Julio Basabe, the son of Juan Basabe and Ana Fernández, was driving the

motorbus at the time of the accident. The certificate from the demographic registry, submitted in evidence to show that Julio Basabe Fernández at the time of the accident was not of the age required by law to entitle him to a license as a chauffeur, shows that Julián Basabe Fernández, the legitimate son of Juan Basabe and Ana Fernández, was born on November 10, 1910. If Julio and Julián are one and the same person then the certificate establishes the fact that the person who was driving the vehicle on February 13, 1926, was at the time 15 years, 3 months and 3 days old. The conclusion reached by the trial court, viz., that Julio Basabe Fernández and Julián Basabe Fernández are one and the same person is fully justified by the evidence. The contention of the appellant that the Julián Basabe Fernández referred to in the certificate is not the Julio Basabe Fernández, the driver of the vehicle, but an illegitimate son of Juan Basabe and Saturnina Dávila, is not supported by the evidence. Julián Basabe himself, when testifying on May 8, 1937, stated that he was 38 years old; that he was born in 1898; and that he was two years old when the Americans came.

As it has, therefore, been shown that Julio Basabe Fernández who was driving the vehicle at the time of the accident was not of the age required to be entitled to a chauffeur's license and that he did not have such license, what is the legal effect of such fact upon the obligations assumed by the defendant company by virtue of the policy issued by it?

The policy involved herein provides that:

"EXCLUSIONS.—The Company shall not be liable for any loss or injury. . . . ; nor for any loss or injury which occurred while the automobile herein described (a) might be engaged in speed racing, *or should be driven by any person under the age, as required by law, when a conductor's license may be obtained, or in any case under 16 years of age; . . . . .*" (Italics ours.)

Among the statements from the insured contained in the policy there is one to the effect that the business or occupation of the insured is that of "public carrier;" and that the insured car is a 22-passenger motor bus engaged in the transportation of passengers from San Juan along Condado and Loíza streets to Calma street and return.

Rule III of the Regulations of the Public Service Commission, approved June 3, 1924, and by virtue of which Juan Basabe filed the policy in question, provides as follows:

"Rule III.—Before authorizing the issuance of a certificate of necessity and convenience, the Commission shall request from the petitioner a mortgage bond or a surety bond, issued by one of the surety companies legally authorized to do business in Puerto Rico, for a sum which the Commission shall fix, which in no case shall be less than three thousand (3,000) dollars for each vehicle, to answer for the compensation awarded by a competent court to any person injured in person or property, or to his heirs in case of death, on account of any accident due to the careless, negligent or defective operation of the motor vehicle used as a public carrier, whether it be operated by the petitioner personally or by any of his agents, employees or subordinates. Said bond, after being examined by the Attorney General of Puerto Rico as to its form and execution, shall be approved by the Public Service Commission, and shall be filed at the office of the Secretary of the Commission, before the vehicle to which said bond refers has been put in service."

In the former case between the same parties, 46 P.R.R. 593, 605, it was held as follows:

"Rule III of the 1924 Regulations had the clear purpose of guaranteeing the public in general, requiring as a prerequisite of the carrier that he post a mortgage or surety company bond to answer for any damages which might be awarded by a court to any person who might suffer by reason of the careless, negligent, or faulty use of the vehicle."

It was held, moreover, that said Rule III was in force at the time of the accident in which the plaintiff was injured.

The appellant urges in his fourth assignment that it was error for the court to hold that the policy issued and filed

pursuant to Rule III, *supra,* was simply an ordinary insurance policy, whereas it should have held the same to be a surety bond; that as the insured vehicle is a public carrier to be exclusively operated as a jitney or motor bus, the policy filed in the instant case must be construed to be a "surety bond" or "jitney bus bond"; and that in accordance with such construction neither the failure to cooperate on the part of the insured in the defense of the action nor the negligence of the insured in letting the motor bus be driven by a minor without a license may be pleaded as valid defenses in an action to recover from the insurer the amount of the judgment against the insured.

The defendant company maintains that the appellant is estopped from raising again this question, as the same has been discussed and determined against him in a former appeal (46 P.R.R. 593). Indeed, on passing upon the question as to the sufficiency of the complaint, raised on demurrer, this court expressed itself as follows:

"We do think that the contract ought to be construed as though the rule were in force, and that consequently it must be held that the company contracted the direct obligation to pay, up to the limit fixed in the policy, any damages which might be awarded by the proper court to any injured person; but we also think that the obligation is conditioned upon the stipulations contained in the policy. The company was liable to the public, but in the form which appears in the policy, as reviewed by the Attorney General and accepted by the commission. There exists a legal connection (*nexo*) between the plaintiff and the defendant, but this connection is governed by the terms of the policy.

" . . . . . . . . .

"The conclusion which we have reached as to the existence of a legal connection between the parties in this case, is also supported by the insolvency clause of the policy itself, whereby a suit by the injured person against the company was authorized, after the rendition of a judgment against the assured after a writ of execution on the judgment should have been returned unsatisfied on account of the insolvency of the assured. Nevertheless, such suit depends upon the conditions of the contract."

The authority relied upon by this court for making the above statements was the decision in *Coleman* v. *New Amsterdam Casualty Co.,* 247 N.Y. 271. The above case is really different from the one at bar as to two essential questions. In the first place, the action in the *Coleman* case, *supra,* was instituted under section 109 of the Insurance Act (Cons. Laws, ch. 28) of New York which provides that the insolvency or bankruptcy of the insured "shall not relieve the insurer from the payment of damages," and "in case the writ of execution . . . . should be returned unsatisfied . . . . on account of such insolvency or bankruptcy, then the action may be prosecuted by the injured person . . . . against said corporation *under the terms of the policy."* The second point of discrepancy is that in the *Coleman* case, *supra,* Endicott Drug Store, Inc., was not bound under any statute to take out an insurance policy for the benefit of its customers. The case involved, therefore, was not merely one of compulsory insurance but of a policy voluntarily taken out by the insured, subject to the requisites of a standard policy of New York, which entitles the beneficiary to sue the insurer, but "under the terms of the policy." The *Coleman* case, *supra,* is similar to that of the owner of a private car who, without any obligation to insure himself under the law takes out an insurance policy to protect himself against any claim for damages resulting from his own negligence or that of his servants. In such cases the injured person is subject to the same defenses that the insurer might interpose against the insured for breach of any of the terms of the insurance contract. It is so held in *Rohlf* v. *Great American Mutual Indemnity Co.,* 27 Oh. App. 208, 161 N.E. 232; *Bauman* v. *Western & S. Indemnity Co.,* 77 S.W. (2d) 496; *McDanels* v. *General Insurance Co. of America,* 35 P. (2d) 394, cited by the appellee. A similar decision was rendered by the Supreme Court of California in *Hynding* v. *Home Accident Ins. Co.,* 214 Cal. 743, 7 P. (2d) 999. And it was so held by this court in *González* v. *U. S. Casualty Co.,* 55 P.R.R.

646, in which there was involved a policy voluntarily taken out by the owner of a truck.

In *González* v. *U. S. Casualty Co., supra*, where citation is made as an authority of the monograph published in 106 A.L.R. 516, 532, we held that the doctrine laid down by most jurisdictions in the United States is to the effect that a person injured in an accident stands in the shoes of the insured as regards defenses based on breaches of conditions subsequent to the accident. And we held under said doctrine that the injured party, González, was not entitled to recover from the insured company the amount of the judgment rendered against the owner of the truck, on the ground that the latter had broken one of the terms of the policy by failing to notify the insurer immediately after being served with notice of the action by forwarding to it the notice and copy of the complaint, as stipulated in the policy.

The doctrine correctly applied by us to the case of *González* v. *U. S. Casualty Co., supra*, is only applicable to those cases where the policy has been taken out voluntarily and not where the insurance is compulsory by statutory provision. The title of the monograph in said American Law Reports reads as follows:

"Validity, construction, and effect of statutory or policy provisions which give injured or damaged person right of action against insurer in respect of indemnity or liability insurance *voluntarily carried.*" (Italics ours.)

Said monograph begins as follows:

"1. Scope. This annotation supplements the earlier annotation in 85 A.L.R. 20, and adheres to the scope outlined at the beginning of that annotation. As there stated, *these annotations are not concerned with compulsory insurance; . . . .*" (Italics ours.)

Indeed, all the cases cited in said monograph refer to voluntary insurance and uphold the doctrine applied by us in the *González* case. Thus, for instance, in *Neilson* v. *American Mut. Liability Ins. Co.*, 111 N. J. Law 345, 168 Atl. 436,

the court held that it is well settled that the injured party, in cases against the insurer, has no greater rights under the policy than the insured, he being bound by the terms of the contract, and can not recover unless the insured could have done so, had he paid the judgment.

As may be seen, the decision in *Coleman* v. *New Amsterdam ·Casualty Co., supra,* was based on a statute which applied to the standard policy of the State of New York the doctrine applicable to cases of voluntary insurance.

 The question raised in the case at bar is new in this jurisdiction. In order to pass upon it we must follow the precedents established in other jurisdictions in cases dealing similarly with compulsory insurance, rectifying, if necessary, our opinion in this same case in the former appeal, 46 P.R.R. 593, where the matter in issue was only the sufficiency of the facts as alleged, without determining the case on its merits.

In *Gillard* v. *Manufacturers' Casualty Co.* (N. J.), 104 Atl. 707, the plaintiff, who had been injured in an accident, sued the insurance company on a judgment recovered against the auto bus owner. The latter had filed an insurance policy with the City of New York, in compliance with a statute which required the filing of such policy in order to secure a license for engaging in the transportation of passengers within the city. In affirming a judgment for the plaintiff, the Supreme Court of New Jersey said:

"The first ground of attack is: The rights of the plaintiff are derivative and can be no more extensive than the rights of the insured. This is a false assumption, its answer is, on the contrary, the rights of the plaintiff are original and primary given by the statute which provides: (Here follow the provisions of the New Jersey statute similar to those of Rule III of the Regulations of the Public Service Commission of Puerto Rico.) By virtue of this provision in the statute, the plaintiff alone can sue, under the policy required to be filed. This is an essential distinguishing feature from that class of cases where there is no right of action because the parties to the suit are not parties to the agreement sued on, as in

(citations follow). The auto bus owner cannot sue on the statutory policy of insurance. . . .

"The insurance policy cannot contain any provisions except those authorized by the statute, so as to affect any person suffering loss, as provided therein. Whatever other provisions the filed policy contains may be good as between the insurer and the insured auto bus owner, and may impose upon the latter certain duties and obligations towards the owner, for breach of which the insurer can maintain an action; but such provisions cannot deprive an injured person of the remedy given by the statute, nor can they in any way abridge the rights granted by the statute to such injured person. The policy of insurance is filed only for the benefit of persons who might suffer injury. It is not filed for the benefit of the city. The city is under no liability which the policy indemnifies it against. The statute was passed only for the benefit of the injured person. The sole beneficiary of the statute is the person injured. The insured person is the only one who can sue under the policy, and cite the statute in support of the action. The injured person's rights in the policy of insurance are original and primary, not derivative and secondary. The first ground of attack therefore fails, because the premise on which the argument is based is not true in point of fact."

On appeal to the Court of Errors and Appeals of New Jersey, the judgment of the Supreme Court was sustained by it, saying:

"It is insisted that the right of the plaintiff to sue is derivative in character, and depends entirely upon the rights of the insured under the terms of the policy. The application of this argument is directed to the fact that since the insured failed to give notice of the accident, and of the pendency of the suit to the insurer, as required by him, by the provisions of the policy, the right of the plaintiff in this case to recover is to be determined by the status thus acquired by the insured, which in effect constitutes a breach of the agreement.

"The contention, it is obvious, ignores the express provision of the policy already quoted, which manifestly was contemplated to meet the situation here presented; for it provides 'that notwithstanding anything herein contained to the contrary, this company will pay any final judgment within the limits of this policy, recovered by person or persons on account of the ownership, maintenance and use of automobiles,' etc., and the further provision that 'this

contract shall be for the benefit of every person suffering loss, damage or injury,' etc." *Gillard* v. *Manufacturers' Ins. Co.*, 107 Atl. 446.

In *Boyle* v. *Manufacturers' Liability Ins. Co.*, 115 Atl. 383, there was pleaded as a defense in the action of the injured party to recover the amount of the judgment rendered against the owner of an auto bus that the original engine or motor in the auto bus had been changed since the issuance of the policy, and another motor of a different type substituted therefor. In affirming a judgment for the injured plaintiff, the Supreme Court of New Jersey said:

"That adjudication demonstrates that the policy of jitney insurance is one of indemnity under the statute for the benefit of the traveling public, and that whatever legal rights or equities may subsist as between the insured and the insurer by reason of any violation of the terms of the policy cannot affect the rights of the public who claim under its provisions after such claim has been substantiated by a judgment at law.

". . . . . What legal effect, if any, such changes in detail may work as between insured and insurer can have no legal relation to the obligation which the insurer owes one of the traveling public, who may be damaged by the negligence of the vehicle while engaged in the designated public use." (Affirmed by the Court of Errors and Appeals of New Jersey.)

The evident purpose of the statute regulating the public service of transportation of passengers by means of auto buses or jitneys is not to allow the owner of the vehicle to operate the same as a public conveyance unless there is filed a *bond,* either a mortgage one or one subscribed by an insurance company to answer for the payment of any judgment that might be rendered in favor of any person injured "on account of any accident due to the careless, negligent or defective operation of the motor vehicle used as a public carrier." It has been the intention of the legislator to provide for those who travel in public auto buses and to pedestrians the absolute guarantee of a bond, in either of the two authorized forms, as a protection against any damage or loss

that might be caused them as the result of the negligence of the public carrier or of the persons entrusted by said carrier with the operation and handling of its vehicles.

The obligations contracted by the surety or insurer for the benefit of the public in issuing the bond or insurance policy are and, to our judgment, can not be other than those fixed by the statute. The injured person is not a party to the bond or insurance contract; he is simply a third party for whose benefit a statutory obligation has been contracted. The protection and security provided for him by the statute can not and must not be curtailed or affected in any way by any stipulation that the surety or insurer and the principal or insured might have deemed it fit to insert in the bond or insurance contract for the regulation of the relations as between the contracting parties

The approval of the bond or policy by the Public Service Commission ''after being examined by the Attorney General of Puerto Rico as to its form and execution,'' can not operate in the sense of abridging or limiting the statutory guarantee, making the injured party answerable for the acts or omissions of the public carrier. Neither the Commission nor the Attorney General is authorized to change or amend the provisions of the statute. If the bond or policy submitted by the public carrier complies with all the statutory requisites and is sufficient as to its form and execution, it is the duty of the Commission and of the Attorney General to approve it. Neither of them is authorized to approve or disapprove any additional stipulations as between the insurer and the insured.

There is in our judgment a basic reason why this doctrine which applies in the case of voluntary insurance should not be applicable to compulsory insurance. In voluntary insurance the insurer binds himself to pay to the insured the amount of any compensation that might be awarded to a person who has been injured as the result of negligence on

432

the part of the insured in handling his automobile, irrespective of the insolvency or bankruptcy of the insured. Where the accident has been due to the negligence of the insured and the latter has complied with the terms and conditions of his contract with the insurer, the latter is bound to pay the compensation even though the insured might have the means to do so; and the insurer can not proceed against the insured to recover what the former has been obliged to pay because of the latter's fault. It is for such reasons and because the insurer is bound under the terms of the policy that the statute allows the injured party to file his action for damages against the insurer and insured jointly. (Insurance Act of 1921, sec. 175.) The statute acknowledges that between the injured party and the parties to the insurance contract there is the legal relation as third party for whose benefit the insurance contract has been entered into.

Where, as in the instant case, the insurance is compulsory the legal situation is different. The obligation of the surety or insurer to the public is that if the public carrier inflicts damages on any person as the result of negligence in driving or operating the vehicle and is adjudged to pay compensation and can not do so owing to insolvency or bankruptcy, the surety or insurer shall pay to the injured party the amount of the judgment obtained by him. This is why a person who had been injured by an auto bus engaged in the transportation of passengers must first secure a judgment against the public carrier; and his right of action against the insurance company does not accrue until the order of execution of the judgment has been returned unsatisfied owing to the insolvency or bankruptcy of the judgment debtor. See: Rule III (E) Regulations of the Public Service Commission and the decision in *Rondón* v. *Aetna Casualty & Surety Co.*, 41 P.R.R. 101, in which this court upheld the validity of the said Regulations and held that the injured person had no cause of action against the insurance company, nor was he entitled to attach

its property, until he secured a judgment against the public carrier. As can be seen, the liability of the insurance company, like that of every surety, is of a subsidiary character. If the insured public carrier fails to pay-because it has nothing with which to pay, then the insurer pays for it. Actually the only thing for which the insurance company is answerable in this kind of insurance is the solvency of the insured for the payment of any judgment that might be obtained against him. The surety, insurer or guarantor of the public carrier may protect itself by means of any agreements or stipulations that it may think fit to insert in the insurance contract, but such agreements or stipulations can not in any way affect the statutory rights of the injured party.

It may be remarked that the foregoing leaves the insurer destitute of all protection against the failure on the part of the insured to fulfil the terms and conditions of the insurance contract, for if the insured becomes insolvent or bankrupt the insurer may not proceed against him to recover the amount paid to the injured third party. The answer to this is that the insurance company, being interested in the insurance business, is in a better position and has better opportunities and means of protecting itself than has any passer-by who without fault or negligence on his part is run over by a jitney driven by somebody who, although having no license under the law to drive it, was authorized to do so by the public carrier secured or insured with the insurance company. The latter can easily protect itself by an investigation of the financial condition of the applicant for the policy and by refusing to issue the same if the applicant is not responsible financially, or by requiring the applicant to furnish collateral security. Any citizen who goes about the streets and thoroughfares is entitled to see that the law enacted for his protection and benefit is complied with and, if unfortunately and without his fault or negligence

434

he is injured, any compensation that might be awarded to him by the courts shall be paid him, according to the law, by the public carrier and in case of failure by the surety or insurer. To hold otherwise would amount to nullify the statute.

We are not convinced by the contention of the appellee that the question involved in this appeal was already tried and disposed of against the appellant. We do not claim to be infallible. If, acting on a wrong construction of the scope of the decision in *Coleman* v. *New Amsterdam Casualty Co.*, *supra*, by sustaining the demurrer to the complaint, we held that the plaintiff in the case at bar should allege in his complaint the performance on the part of the insured public carrier of the terms and conditions of the policy, now, in considering and passing upon the case on its merits, after a more careful consideration of the decisions applicable to the question, which is new in our jurisdiction, we must not hesitate to rectify and leave without effect in this particular our opinion in the previous appeal published in 46 P.R.R. 593.

For the foregoing reasons, it is our opinion that the right of the plaintiff to recover from the defendant the amount of the judgment rendered in his favor can not be affected by the conduct of the insured in refusing to cooperate in the defense of the action and in entrusting the operation of the jitney to somebody without authority to drive automobiles.

The judgment appealed from must be reversed and another entered in lieu thereof adjudging the defendant to pay to the plaintiff $3,000 as compensation, plus $602.75 as costs and attorney's fees, that is, a total of $3,602.75, with legal interest thereon at 6 per cent from December 6, 1926, when judgment for him was entered, until the same is fully paid.

Mr. Justice De Jesús took no part in the decision of this case.